**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

In re:                                                    :      **Chapter 11**

**Unbreakable Nation Co.,**                    :

                              **Debtor.**        :      **Case No. 09-10131 (JKF)**
_____

## MEMORANDUM OPINION
## SUPPORTING APRIL 21, 2010 ORDER CONFIRMING AMENDED PLAN OF REORGANIZATION/LIQUIDATION AND APPROVING THE SALE OF CERTAIN ASSETS OF THE DEBTOR FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES

BY:    JEAN K. FITZSIMON
       United States Bankruptcy Judge


Following a confirmation hearing (the "Confirmation Hearing") held on

April 13 and 21, 2010, this Court confirmed the Amended Plan of Reorganization/

Liquidation which the Debtor, Unbreakable Nation Co., filed on March 9, 2010.  At

the conclusion of the Confirmation Hearing, the Court issued a bench ruling

confirming the Plan and explaining the rationale for its ruling.  After the hearing,

the Court issued an Order, dated April 21, 2010 (the "Confirmation Order"),

confirming the Plan.  See Docket entry no. 388.  Zen Investments, LLC (f/k/a

Stafford Investments, LLC), John Stafford, Jr., John Stafford, III and Charlestown,

LLC (collectively, the "Objectors" or the "Staffords"), who filed an objection to

confirmation of the Debtor's Plan, see Docket entry no.371, appealed the

Confirmation Order on May 4, 2010.  The Court submits this Memorandum

Opinion, pursuant to Local Rule 8001-1(b),[1] to further expound upon the reasons for the Confirmation Order. The discussion below also represents the Court's findings of facts and conclusions of law.

# I. BACKGROUND

***The Bankruptcy and Relevant Filings***

On January 7, 2009, the Debtor filed for bankruptcy protection under Chapter 11 of the Code.  On March 11, 2009, the Objectors filed two unsecured and unliquidated proofs of claim (the "Claims," or the "Stafford Claims," claims nos. 5 and 6).  The Claims relate to litigation that the Objectors were pursuing pre-petition against the Debtor and others in the United States District Court for the Eastern District of Pennsylvania (the "District Court Actions").[2]  The Debtor filed objections to the Claims (Docket entries nos. 167 and 169).[3]

Following contentious litigation between the Objectors and the Debtor regarding the Claims and certain other matters (including a Motion to Appoint a

---

[1] Local Rule 8001-1 (b) provides: *Opinion in Support of Order*.  The bankruptcy judge whose order is the subject of an appeal may, within 15 days of the filing of the notice of appeal, file a written opinion in support of the order or a written supplemental opinion that amplifies any earlier written opinion or recorded oral bench ruling or opinion.  L.B.R. 8001-1(b)(2008).

[2] Claim Five is a suit against the Debtor and others which states the following 12 causes of actions: 1) Breach of Fiduciary Duty; 2) Aiding and Abetting Breach of Fiduciary Duty; 3) Oppression of Minority Shareholders; 4) Breach of Contract; 5) Conversion; 6) Aiding and Abetting Conversion; 7) Unjust Enrichment; 8) Fraud; 9) Aiding and Abetting Fraud; 10) Declaratory Relief pursuant to 28 U.S.C. § 2201; 11) Constructive Trust and Accounting; and 12) Civil Conspiracy.  Claim Six, in response to certain actions by the District Court, is an identical pleading to Claim Five although it does not contain Count Nine (Aiding and Abetting Fraud) or Count 12 (Civil Conspiracy).

[3] On March 19, 2010, Judge Fehling issued an Order granting in part and denying in part the Debtor's Ominbus Motion in Limine.  Docket entry no. 349.  The Debtor has sought review of this Order by the district court.  Docket entry no. 385.

Trustee), the Debtor initially filed its Plan and Disclosure Statement on

December 7, 2009.  Docket entries nos. 291 and 292.  These documents were

twice revised into their current forms, filed on March 9, 2010.  Docket entries nos.

336 and 337.[4]

## Background of the Debtor

Unbreakable Nation is a Pennsylvania corporation that sells patented anti-

theft devices generally known as Unbreakable AutoLock for cars, boats, and

bikes.  Disclosure Statement, Docket entry no. 337, at 8.  The Debtor's products

are distributed to Pep Boys, Autozone, O'Reillys and Strauss Discount Auto,

among other stores pursuant to certain "shelf space" contracts.  Id.  Lawman

Armor Corporation was the Debtor's predecessor and changed its name to

Unbreakable Lock Company in 2004.  Id.  Unbreakable Lock Company merged

with the Debtor in 2006.  Id. at 9.  The Debtor licenses the patents for the

Unbreakable technology from VI Capital Company and has agreed to maintain

the patents in exchange for a royalty-free license.  The sale of the assets of the

Debtor will trigger royalty provisions in the Licensing Agreements if Robert Vito

will no longer be in charge of the Debtor.  Id. at 9, 11.  From 2002 until now (i.e.,

including post-petition financing), the Debtor has been financed by VI Capital, an

entity owned by Mr. Vito.  Id. at 10.

---

[4] An Order approving the Amended Disclosure Statement and setting the Confirmation Hearing for April 13, 2010 was entered on March 10, 2010.  Docket entry no. 341.

Robert Vito is the founder, President and Chairman of the Board of Directors of the Debtor.  Disclosure Statement at 11.  Kyle Cunningham is the Chief Financial Officer.  Id.

***The Plan***

The Plan of Reorganization provides a schedule for the distribution of the Debtor's assets (which will be sold pursuant to the terms of the Plan).  In accordance with Plan, administrative claims of between $500,000 and $600,000 are not classified and will be paid in cash.  Disclosure Statement at 20; Plan at ¶3.1.  The priority and secured tax claims, in the total approximate amount of $10,838, are not classified and will be paid in full on the Effective Date[5] of the Plan.  Plan at ¶3.2.  In addition to the above payouts, the Plan creates five (5) classes of claims as follows:

| Class | Name | Status | Voting Right |
|-------|------|--------|--------------|
| 1 | Other Priority Claims | Impaired | Entitled to vote |
| 2A | VI Capital Claim | Impaired | Entitled to vote |
| 3 | Stafford Claim | Impaired | Entitled to vote |
| 4 | Other Unsecured Claims | Impaired | Entitled to vote |
| 5 | Shareholders | Impaired | Not entitled to vote |

---

[5] Effective Date is defined to mean "fifteen (15) days after the date on which the Confirmation Order is entered."  Plan at 5.

4

Plan at ¶4.1.  Class One Claims consist of holders of priority claims which are not

professional or tax claims and will be paid in full to the extent of the Allowed

Priority Claim[6] in cash on the Effective Date.  Plan at ¶6.1.  Class Two consists of

VI Capital's claim arising from its post-petition loans to the Debtor to the extent

allowed as an administrative claim by Court order.  Plan at ¶6.2.  Class Two has

an Allowed Administrative Claim of $63,000 plus 5% interest from the date of the

advance, pursuant to the orders of the Court permitting VI Capital to provide post-

petition financing to the Debtor.  Id.  If the Court allows, VI Capital will have an

additional Allowed Administrative Claim[7] of $57,000 for post-petition loans to the

Debtor; otherwise the $57,000 will be treated as a Class 4 Claim or Class 5

interest as determined by the Court on motion of VI Capital.

Class Three, which is the one most relevant in this dispute, consists of the

Objectors' Claims.  See Exhibit B to Disclosure Statement.  Treatment of Class

Three is as follows:

> The Holder of Class 3 Claim is impaired and shall be entitled
> to vote to accept or reject the Plan.  Upon the later of (1) as soon as
> practical after the Effective Date or (2) the date the Stafford Claim
> becomes an Allowed Claim,[8] the Holder of the Stafford Claim shall

---

[6] "Allowed Priority Claim" means (a) a Claim that has been allowed by a Final Order or (b) a
Priority Claim as to which Claim an objection to the Claim has not been interposed, or (c) a Priority Claim
as to which Claim an objection has been interposed, which objection had been resolved by a Final Order
to the extent such objection is determined in favor of the Holder of such Claim."  Plan at 3.

[7] "Allowed Administrative Claim" means "an Administrative Claim that has been allowed by a Final
Order."  Plan at 3.

[8] "Allowed Claim" is defined as "a Claim that has been allowed by a Final Order; (b) a Claim which
is specified herein to be an Allowed Claim; or (c) a Claim timely filed with the Office of the Clerk of the

(continued...)

receive in full satisfaction and payment of its Claim, its pro rata share
(based upon the Stafford's Allowed Claim plus the other Allowed
General Claims) of the Unsecured Fund; provided, however, that if
the Unsecured Fund[9] is limited to $100,000, the distribution to
Class 3 creditors shall not exceed Fifty Thousand Dollars ($50,000)
and provided that, if the Court finds that the Class 3 Claim shall be
subordinated in accordance with 11 U.S.C § 510(b), the Holder of
the Class 3 Claim shall receive no distribution and the entire
proceeds of the Unsecured Fund shall be distributed to Holders of
Class 4 claims as described in Section 6.4 of this Plan.

Plan at ¶ 6.3.[10]

Class Four consists of general unsecured claims.  They shall receive an

initial pro rata distribution of $50,000 and a final distribution 20 days after the date

of the Final Order[11] either allowing or expunging the Stafford Claim or determining

that it is subordinated by operation of law.  Plan at ¶¶6.3-4 (as amended by the

Confirmation Order).  Class Five, consisting of equity interests of the Debtor, will

---

[8](...continued)
Court or scheduled by the Debtor in its Schedules as neither unliquidated, disputed or contingent and as
to which Claim (i) no objection with respect to the allowance thereof has been or shall be interposed, or
(ii) as to which Claim an objection to the Claim has been interposed, which objection has been resolved by
a Final Order to the extent such objection is determined in favor of the Holder of such Claim. . . ." Plan
at 3.

[9] "Unsecured Fund" is defined as "One Hundred Thousand Dollars ($100,000) earmarked from
the sale of proceeds plus all Sale Proceeds (including Contributed Proceeds) in excess of all Allowed
Administrative Claims, Tax Claims, Other Priority Claims and VI Capital's Allowed Administrative Claim to
be distributed on a pro rata basis on account of Allowed General Unsecured Claims and any Allowed
Stafford Claim."  Plan at 8 (emphasis in original).

[10] This paragraph was modified by the Confirmation Order.  Docket entry no. 388, Exhibit A.

[11] "Final Order" means "an order of the Court . . . to which (a) any appeal that has been taken has
been determined finally or dismissed and such order has not been appealed, reversed, stayed, modified
or amended and (b) the time for appeal of for requesting reargument or further review or rehearing has
expired and no motion or similar pleading having the effect of tolling or otherwise extending the time to file
an appeal or any such request has been filed and not yet determined. . . ."

receive no distribution and will be deemed to have rejected the Plan.  Plan at
¶6.5.

The Plan will be funded through cash on hand, proceeds from a sale of the
Debtor's assets, and proceeds from the sale, if any, of intellectual property
contributed to the estate by VI Capital.  Plan at ¶7.1.

The Plan calls for an auction of the all Debtor's assets with or without rights
to the Licensing Agreements and patents as follows:[12] (1) the assets alone;
(2) the assets plus an assignment of the Licensing Agreements; or (3) the assets
plus the patents.  A qualified bidder may bid in any of these ways.  Plan at
¶7.2(a).  The initial bid for the assets must be $750,000 or up to $3.5 million if the
bid includes the intellectual property.  Plan at ¶7.2(e).

Pursuant to Article X of the Plan, one of the effects of confirmation of the
Plan is that "any and all avoidance actions for the Debtor . . . shall be
extinguished."  Plan at ¶10.3.[13]  In addition, the Plan contains an injunction,
enjoining those with claims against the Debtor from pursuing them post-
confirmation against the Debtor or its successors.  Plan at ¶10.5.

---

[12] The Licensing Agreements are those between VI Capital and the Debtor "concerning the use of
the patents by Debtor for the Unbreakable line of products. . . ."  Plan at 6.

[13] As discussed below, this provision was modified by the Confirmation Order to reflect that the
avoidance actions of the Debtor will not be extinguished as of the Effective Date if the Objectors' Motion to
Prosecute and Object to Avoidance Actions (docket entry no. 363) is granted by the Court.  See Docket
entry no. 388, Exhibit A.

The Debtor filed three reports of plan voting: an initial report on April 5, 2010 (Docket entry no. 370), an amended report on April 13, 2010 (Docket entry no. 375) and a second amended report on April 14, 2010 (Docket entry no. 380). As discussed below, the last of these reports shows that the Debtor has sufficient accepting votes pursuant to 11 U.S.C. §§ 1126 and 1129 (a)(10) to confirm the Plan.[14]

**The Confirmation Hearing**

As stated above, the Confirmation hearing was held on April 13, 2010 and continued telephonically on April 21, 2010.  Following the Confirmation Hearing, the Court entered the Confirmation Order.  The Court's ruling and reasons for confirming the Debtor's Plan over the objections were given on the record at the conclusion of the April 13th hearing.

At the Confirmation Hearing, Mr. Vito, President, Chairman, and CEO of the Debtor, testified that the Debtor filed for bankruptcy protection in 2009 due to the costs of the pending litigation.  Transcript of the Confirmation Hearing, Docket entry nos. 412, 413, and 415, hereinafter "Tr.,"[15] at 29.  Mr. Vito testified that business declined in 2001 when the company moved from a direct response television campaign to retail, and opened a five million dollar line of credit with the

---

[14]   The Objectors initially raised an issue at the Confirmation Hearing regarding whether Class Four, which was the accepting impaired class, had enough votes to accept the Plan.  However, this objection was resolved at the continuation of the Confirmation Hearing on April 21, 2010.

[15]   Transcript references refer to the April 13, 2010 hearing date (Docket entry no. 413) unless otherwise noted.

Staffords.  Tr. at 30.  Currently, the only source of funding of the Debtor is

through Mr. Vito via VI Capital.  Tr. at 34.  Mr. Vito testified that the Debtor is in

danger of losing its shelf space in retail stores due to the fact that it cannot fund

the purchase of its inventory.  Tr. at 34-6.   According to Mr. Vito, the assets of

the Debtor are inventory, accounts receivable, and the shelf space contracts.

Tr. at 36.  The value of these items will vary depending on whether shelf space is

lost or inventory is delivered.  Id.

With regard to the patents on the products, Mr. Vito is the licensor, but the

underlying patents were transferred to VI Capital in 2005.  Tr. at 39.  Pursuant to

these agreements (the "Licensing Agreements"), Mr. Vito licenses the patents for

the 118 products to the company for "a dollar and other value," but if Mr. Vito is

no longer president and CEO of the company then the licence would convert into

a royalty agreement for which Mr. Vito would receive $250,000 per quarter, per

patent license or $2.50 per unit, whichever is greater.  Tr. at 39.  The Staffords

acknowledge receiving a private placement memorandum in 1999 which

contained disclosure of the Licensing Agreements.  Tr. at 47.

In December 2002, the Debtor's board of directors, independent of

Mr. Vito, confirmed the Licensing Agreements.  Tr. at 51-3;93; Exhibit D-6.[16]  The

Licensing Agreements were updated in 2003 and 2005 .  Tr. at 52; Exhibits D-7,

D-8, and D-9.

---

[16] The Exhibits were admitted into evidence at the conclusion of the hearing.

Mr. Vito testified that the assets of the Debtor placed for auction on March 26, 2010 included existing inventory, shelf space contracts, accounts receivable, seven licence agreements, and the patents. Tr. at 58. Unbreakable Unlimited Company ("UUCO"), of whom Mr. Vito is the president, offered an opening bid for the assets of $850,000. Tr. at 59. Mr. Vito testified that he arrived at a figure of $850,000 through calculating that the receivables would be worth approximately $230,000, the inventory $200,000, and adding an amount for administrative cost. Id. There was an opportunity for other bidders to bid on the assets in addition to an assignment of the Licensing Agreements or outright purchase of the patents. Tr. at 60. Mr. Vito testified that he agreed to a reduced royalty under the Licencing Agreements; his fee was reduced from $250,000 for each of seven licenses to $250,000 for all seven licenses per quarter. Id. In addition, the Plan reduced the amount required by a bidder to escrow for future royalties from two million to one million. Id. These reductions were intended to attract competitive bidding. Id. at 59-60.

The minimum price for a bidder to pay for the assets plus the patents was three million dollars. Tr. at 61. Mr. Vito testified that VI Capital allowed the patents to be sold with the Debtor's assets "as a way to preserve the value of the estate and to get the most dollars into the estate." Tr. at 62. The Debtor marketed the patents and other assets by taking two consecutive ads out in the Philadelphia Inquirer, and by sending bid packages to its competition, other

parties who previously had expressed interest, and investment bankers who would likely be interested in this type of product.  Id.  At least two parties indicated some interest and ultimately two other entities signed confidentiality agreements in exchange for the right to receive detailed information regarding the Debtor's operations.  Tr. at 81.

The Debtor has a commitment from the Coleman Group, an investment banking firm, to raise capital of between three and five million dollars in funding once the bankruptcy is complete and the Debtor is free and clear of litigation and liens.  Tr. 97-8.

Mr. Gregory Urbanchuk, an expert in forensic economics,[17] who prepared a report that was submitted with the Objection, also testified at the Confirmation Hearing.  Mr. Urbanchuk examined the auction procedures and concluded the following with regard to the three options outlined in the Plan.  Option number one is viable only for UUCO and Mr. Vito because he owns the entity that owns the intellectual property.  Tr. at 117.  With regard to option number two - the purchase of the assets plus the Licensing Agreements - Mr. Urbanchuk opined that this would not be attractive to outside bidders because the cost of the License Agreements exceeds projected net sales.  Tr. at 119.  Mr. Urbanchuk further testified that option number three was not viable because he determined the

---

[17] Mr. Urbanchuk performs financial, economic, and valuation analysis related to matters in dispute.  Tr. at 105.

11

operating value of the Debtor was $1.2 million, not $3 million[18] and he therefore

failed to see how an interested buyer would make a bid.  Tr. at 125.

Mr. Urbanchuk conceded that in preparing his report he did not review projections

going out several years; instead, he only reviewed one year.  Tr. at 137.  No

prospective purchaser appeared to complain about the auction process.  The

Objectors had access to all of the possible purchasers and investments bankers

yet did not produce anyone who claimed not to have bid because of the License

Agreements or patent purchase requirements.

***The Objection***

The Objectors' pleading quarrels with the Plan on the following six bases:[19]

(1) the Plan is not proposed in good faith; (2) the Plan impermissibly classifies the

Objectors' Claims from the rest of the Debtor's other unsecured creditors; (3) the

Plan artificially impairs classes of claims despite the fact that the Plan (and the

proposed treatment to be made thereunder) does not alter the legal, equitable or

contractual rights of these creditors; (4) the Plan estimates the claims in

derogation of the express terms of Bankruptcy Code section 502(c)(1); (5) the

Plan does not meet the Best Interests of Creditors Test; and (6) the Plan releases

---

[18] Mr. Urbanchuk referred to $3 million, though the Plan calls for a bid of $3.5 million.  Plan at
¶ 7.2(e).

[19] Objections to the Plan were also filed by the Pennsylvania Department of Revenue (Docket
entry no. 354) and the United States Trustee (Docket entry no. 356).  However, these objections were all
resolved before or during the confirmation hearing.  Creditor Joshua I. Smith filed an Objection (Docket
entry no. 372) joining the pleading of the Objectors.

claims without adequate consideration or meeting the requirements of Bankruptcy Rule 9019. Objection, Docket entry no. 371. The Court shall address in detail the Objectors' arguments that the Plan was not filed in good faith and that the Plan impermissibly classifies the Claims. See Section II below.

The remaining four bases of the Objectors' pleading are either moot or settled. First, the Objectors' contention that Classes One and Two are artificially impaired is irrelevant because even if this were so (and the Court were to discount these classes as impaired), Class Four is impaired and voted to accept the Plan in compliance with 11 U.S.C § 1129(a)(10). The Objectors do not dispute this.

Second, once the Court determines that the Plan's classification of the Objectors' Claims *is* permissible (as it did at the Confirmation Hearing and expounds on below), the Objectors' point four (that estimation of the Claims is improper for confirmation purposes) becomes moot. In other words, the Claims are in a separate class, so the amount of the Claims for voting purposes is not a substantive point; these Claims are the only members of the class.

Third, the argument that the Plan does not meet the Best Interests of Creditors Test as laid out in the Objection merely incorporates and repeats the Objectors' assertions regarding both the Plan's alleged lack of good faith and

impropriety of the non-debtor releases.  Therefore, the argument need not be

separately addressed.[20]

Last, with regard to the objection that release of avoidance actions

provided for in Section 10.3 is impermissible, the Plan was modified to reflect that

if the motion of the Objectors to prosecute avoidance actions (Docket entry no.

363) is granted, then the avoidance actions would not be extinguished as of the

Effective Date of the Plan.  This compromise satisfied the Objectors' request.[21]

Tr. at 23.

Therefore, the Court's discussion focuses on two of the six bases raised in

the Objectors' pleadings, namely whether the Plan was filed in good faith and

whether the classifications are permissible.  Neither of these arguments presents

a basis for denying confirmation of the Plan.

## II. THE PLAN COMPLIES WITH SECTION 1129

In Order for a bankruptcy plan to be confirmed, the plan proponent must

show that each of the elements enumerated in 11 U.S.C. § 1129(a) have been

met.  In re H.H. Distributions, L.P., 440 B.R. 44, 50 (Bankr. E.D. Pa. 2009).  In

---

[20] As discussed in Section II of the Opinion, the Plan meets the Best Interests of the Creditors Test pursuant to § 1129 (a)(7) of the Code.

[21]   The Court also notes that the Objectors' initial difficulty with the Plan's injunction in section 10.5 was resolved at the Confirmation Hearing, at which time it was agreed (to the satisfaction of counsel for the Objectors) that this provision applies only to the Debtor and its successors and not to Mr. Vito or other entities owned by him.  Tr. of April 21st hearing at 8-9.  Further, section 12.2 of the Plan, which contains the exculpation provision, was amended per court order (docket entry no. 414) to reflect the fact that this release would apply only to the Debtor.

discussing the Debtor's demonstration of having met the requirements of § 1129, the Court will address the remaining two objections to the Debtor's Plan.  In addition, because the Objectors are impaired and have rejected the Plan, the Code's cramdown provision (§ 1129(b)(1)) is discussed below.

### The Plan was Proposed in Good Faith

The first and primary complaint of the Objectors is that the Plan was not filed in good faith.  This is inextricably intertwined with the good faith of the auction as it is the basis of the Plan.  After consideration of the case law, the pleadings, the facts, and evidence presented at the Confirmation Hearing, the Court rejects this argument and finds that the Plan was, in fact, filed in good faith.

Pursuant to § 1129(a)(3), a plan must be filed "in good faith and not by any means forbidden by law."  In determining good faith, the "important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code."  In re PWS Hldg. Corp., 228 F.3d 224, 242 (3d Cir. 2000) (citation and internal quotation omitted).  The requirement that a purchaser act in good faith "speaks to the integrity of his conduct in the course of the sale proceedings.  Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."  In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143, 147 (3d Cir. 1986 ).  The "totality of

15

the circumstances" must be considered by a court when determining whether a case has been filed in "good faith."  In re TCI 2 Holdings, LLC., ___B.R.___, 2010 WL 1540115, at *13 (Bankr. D.N.J. Apr. 12, 2010) (citing In re PPI Enterprises, Inc., 324 F.3d 197, 211 (3d Cir. 2003)).  The burden to establish good faith is on whomever is proposing the plan.  In re PPI Enterprises, Inc., 324 F.3d 197, 211 (3d Cir. 2003).  Mr. Vito testified that the Debtor was completely out of funds to continue operations or purchase inventory and that no investor or lender was willing to come forward until the Debtor resolved all litigation against it; thus a sale plan was the Debtor's only option.

In support of their argument that the Plan was not filed in good faith, the Objectors cite In re Coram Healthcare Corp., 271 B.R. 228 (Bankr. D. Del. 2001). In Coram, the court held that the debtor's plan was not filed in good faith because the debtor's CEO and President had a conflict of interest due to the fact that he held a separate employment contract with one of the debtor's largest creditors. 271 B.R. at 235-6.  Such is not the case here; there is no suggestion that Mr. Vito, the Debtor's President and CEO, has a conflict of interest or divided loyalties.  Similarly, In re Barr, 38 B.R. 323 (Bankr. E.D. Mich. 1984), also relied on by the Objectors, is inapposite.  In Barr, the debtor's plan was held to lack good faith where a wealthy relative stepped in to fund the plan and keep his family members employed in the same business while discharging approximately one million dollars in unsecured debt.  The court there held that the cramdown

16

clause "presupposes a rational economic calculus as a premise to competitive bidding." 38 B.R. at 325. As discussed below, here the Debtor has shown that it took rational and planned steps to insure that the bidding process was competitive. There is no evidence that the auction was rigged to insure that UUCO would prevail; Barr is therefore not instructive. Moreover, the Plan was proposed to ensure a return to unsecured creditors; in the absence of the sale no money would be available for anything but administrative claims.

The Objectors allege that the Court cannot confirm the Debtor's Plan because the auction was not proposed or conducted in good faith. The Court rejects this argument for the following reasons. Although it is true, as discussed at the Confirmation Hearing, that the sale of the Debtor's assets was potentially problematic in that there were no other bidders and the assets were sold to an insider, ultimately the auction process produced interested potential bidders and a significant benefit to creditors, namely the full payment of administrative and priority claims and a payment of $100,000 to unsecured claims. No evidence has been put forth that the auction is tainted by fraud. To the contrary, the Debtor presented evidence that the auction was repeatedly advertised to prospective buyers, that a full and fair opportunity to bid was presented, and that, in fact, two confidentiality agreements were received by the Debtor. That these confidentiality agreements were obtained demonstrates that those with knowledge of this particular marketplace and company were at least sufficiently

17

interested in purchasing to expend time and money to examine the assets and that they saw value in the Debtor.  Additional evidence presented at the Confirmation Hearing showed that Mr. Vito analyzed what a reasonable price for the Debtor would be and offered more than this amount.  In the end, the $850,000 bid by UUCO provided a much needed infusion of cash for a Debtor about to lose its shelf space contracts and deny any payment to its unsecured creditors.  The fact that UUCO was the only bidder under the first option does not demonstrate that no other bidder could elect that option.  To obtain the same benefit as UUCO - *i.e.*, access to the patents for the cost of maintaining them - required only that the bidder retain Mr. Vito as president and CEO.

In addition to objecting to the first auction option (the one which prevailed), the Objectors also take issue with auction options two and three proposed in the Plan - that the assets could be purchased with an assignment of the Licensing Agreements or (option three) that the assets could be purchased with the addition of the intellectual property.  Plan at ¶7.2(a).  The Objectors contend that each of these options chill bidding because they would require over-payment to UUOC and Mr. Vito.  Objection at 6-8.  However, Mr. Vito testified both that the board of directors independently confirmed the Licensing Agreements and that he has voluntarily taken a reduction in the amount he is entitled to receive by virtue of these agreements.  Tr. at 51-3; 60.  The Objectors' assertion that the Debtor has somehow conspired with Mr. Vito with regard to the Licensing Agreements has no

18

merit.  Again, as the Objectors had unfettered access to all potential bidders, had

these been impediments to bidding, the Objectors could have raised the issue

before or at the time of the auction or could have produced potential bidders who

so alleged.

The Objectors also rely on the report and testimony of Mr. Urbanchuk, their

expert witness, who testified that he does not consider auction options two and

three viable because 1) the cost of the Licencing Agreements exceeds net sales;

and 2) the value of the Debtor is closer to $1.2 million than $3 million.  However,

Mr. Urbanchuk did not take into account all relevant factors that impacted the

Debtor's sales, such as the Debtor's inability to acquire funding in order to

operate and grow.  Nor does Mr. Urbanchuk's report analyze projections past

next year.  Docket entry 371-1, Exhibit A.[22]  Therefore, the Court does not

consider Mr. Urbanchuk's report and testimony a persuasive opinion on the value

of the Debtor or the viability of the auction.  The Objectors presented no other

evidence to rebut the Debtor's demonstration that the auction and sale were

conducted and concluded in good faith and in the best interests of creditors.[23]

---

[22] Mr. Urbanchuk's report also errs in asserting that "the Licensing Agreements were not the
result of an arms length negotiation."  Docket entry no, 371-1, Exhibit A at 13.  As discussed above, the
board independently approved the Licensing Agreements.

[23] For example, the Objectors did not present testimony or evidence from any witness that the
auction process was either tainted, that potential bidders were dissuaded due to the auction procedures or
requirements, or that it failed to produce a substantial payment for the estate and its creditors.  Indeed, the
Court advised the Debtor and the Objectors that it would be available the morning of the auction to
address any dispute or issues that arose.

Thus, the Court finds that, upon a consideration of the totality of the

circumstances, the Debtor has provided sufficient evidence that its auction and

Plan were proposed in good faith.[24]

### Classification of the Objectors' Claim is Permissible

Contrary to the assertion of the Objectors, the Plan's separation of classes

is not in violation of the Code or contrary to law.  Pursuant to 11 U.S.C § 1122(a),

"a plan may place a claim . . . in a particular class only if such claim . . . is

substantially similar to the other claims or interests of such class."  According to

the Third Circuit, "Section 1122(a) does not expressly provide that 'substantially

similar' claims may not be placed in separate classes . . . the Code does not

necessarily prohibit the placement of similar claims in different classes."  John

Hancock Mutual Life Ins. Co v. Route 37 Business Park Associates., 987 F.2d

154, 158, 162 (3d Cir. 1993) (further noting that "[i]f the debtor had offered

reasons that created a reasonable possibility of confirmation, we would hold that

the lift stay motion was properly denied.").  Classification of claims by the debtor

must be reasonable.  See, e.g., Olympia & York Florida Equity Corp. v. The Bank

of New York (In re Holywell Corp.), 913 F.2d 873 (11th Cir. 1990); In re Bryson

Properties, XVIII, 961 F.2d 496 (4th Cir. 1992).

---

[24] The Court also rejects the Objectors' suggestion that the fact that the Debtors' schedules and
Report of Plan Voting were amended on more than one occasion is evidence of bad faith.  There is simply
no evidence to show this under the above standard.

Here, the Debtor's placement of the Stafford claimants in a separate class is certainly reasonable.  These claimants are distinct from the other unsecured creditors for at least two reasons.  First, the other unsecured creditors (in Class Four) are trade creditors or debts acquired in the ordinary course of business and are distinct from the Stafford claimants, whose alleged debts exclusively arise from their shareholder status in the Debtor's predecessor.  See Exhibit B to Disclosure Statement.

Second, the Claims belong in a separate class because they may well be subordinated pursuant to section 510(b) of the Code.  According to 11 U.S.C. § 510(b), "a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, *shall* be subordinated to all claims. . . ." (emphasis added).  Section 510(b) "represents a Congressional judgment that, as between shareholders and general unsecured creditors, it is shareholders who should bear the risk of illegality in the issuance of stock in the event the issuer enters bankruptcy."  Baroda Hill Investments, Ltd. v. Telegroup, Inc. (In re Telegroup, Inc.), 281 F.3d 133, 141 (3d Cir. 2002).  The Objectors' Claims, which include, among other relief, counts of oppression of minority shareholders and breach of fiduciary duty, appear to fall within the scope of claims which would be

21

subordinated pursuant to 11 U.S.C. § 510(b).[25]  As such, there is a reasonable

basis for the Plan's separation of the Claims into a distinct class with separate

treatment.[26]  The Debtor has, therefore, offered valid reasons for the Plan's

classification of claims, namely that Class Three and Class Four represent

fundamentally different interests and may require different treatment.[27]

**The Requirements for a Cramdown are Met**

In order to confirm the Plan and satisfy the requirements of 11 U.S.C

§ 1129(a), all impaired classes must accept the Plan.  If all impaired classes fail

to accept the Plan, the Code permits confirmation through the cramdown

provision in 11 U.S.C § 1129(b)(1), which allows the confirmation of a plan over

the objection of an impaired class if the "plan does not discriminate unfairly, and

is fair and equitable, with respect to each class of claims or interests that is

impaired under, and has not accepted, the plan."  11 U.S.C § 1129(b)(1).

In order for a Debtor to proceed with a cramdown, all requirements of

§ 1129(a) (except for the plan's acceptance by each impaired class of claims or

---

[25] The relief provided for in Section 510(b) is mandatory.  In re Alta+Cast, LLC, 301 B.R. 150 (Bankr. D. Del. 2003).

[26] The Confirmation Order revised Section 6.3 of the Plan to provide that if Class Three Claims (the Stafford Claims) are subordinated in accordance with 11 U.S.C. § 510(b), then the holders of these claims "shall receive no distribution."  Plan, ¶ 6.3.  The Plan thus does not violate the absolute priority rule.

[27] The Court has considered In re D&W Realty Corp., 165 B.R. 127, 128 (S.D.N.Y. 1994), relied on by the Objectors.  In that case, however, there was "no business reason or other Code-based difference . . . proffered in support of separate classification."  As discussed above, such is not the case here.

interests pursuant to § 1129(a)(8)), must be met.  See Bank of American Nat'l

Trust and Savings Ass'n v. 203 North LaSalle Street P'Ship, 526 U.S. 434, 441

(1999).  Of particular importance is that a debtor satisfy provision § 1129(a)(10)

(that the plan be accepted by at least one class of impaired creditors) and

§ 1129(a)(7) (the Best Interests of the Creditors Test).  Id.  As discussed above,

the Plan satisfies § 1129(a)(10) because Class Four is impaired and has voted to

accept the Plan.  The Court also finds that the Plan satisfies § 1129(a)(7) and is

in the best interests of the creditors.  Upon consideration of whether the impaired

classes would receive "on account of such claim . . . a value . . . that it not less

than the amount that such holder would so receive or retain if the debtor were

liquidated under chapter 7. . . ."  the Court finds that there is ample evidence that

the claimants will receive a better payout through the Plan than if this case were

converted to Chapter 7.  If this case were converted, the Debtor's sales will

decline to nothing upon exhaustion of the existing inventory, resulting in the loss

of the shelf space contracts, and the unsecured creditors would then receive *no

payment* on their debts.[28]  The Objectors have not argued to the contrary.  Thus

the Plan satisfies the Best Interests of the Creditors Test as set forth in

§ 1129(a)(7).

---

[28] In fact, the testimony and evidence shows that there is no liquidation value to unsecured creditors in this case.  The approximate liquidation value of the Debtor is $430,000 (Tr. at 59), which would be consumed by administrative claims of at least $500,000 (Plan at ¶3.1).  Therefore the cramdown issue centers on the reorganization surplus of $100,000 produced by the auction for unsecured creditors.

Given that all other requirements of § 1129(a) are satisfied, the question remains of whether the Plan satisfies the requirements for a cramdown. The Plan must not discriminate unfairly and must be fair and equitable. The Court finds that both of these conditions are met.

First, the Debtor's Plan does not "discriminate unfairly" pursuant to § 1129(b)(1). See In re Armstrong World, Inc., 348 B.R. 111, 121 (D. Del. 2006) ("[t]he pertinent inquiry is not whether the plan discriminates, but whether the proposed discrimination is 'unfair'"). A court only needs to reach the question of whether discrimination is unfair "if it first finds that the Plan discriminates at all." Id. at 122. (citing In re Dow Corning Corp., 244 B.R. 696 (Bankr. E.D. Mich. 1999)) and noting that "a presumption of unfairness only arises if the proposed plan provided for 'either a materially lower recovery or a greater allocation of risk' for the dissenters. A finding that all classes of the same priority will receive the identical amount under the proposed Plan is not necessary to find that the Plan does not discriminate"). Here, the Court determines that the Plan does not discriminate. Classes Three and Four (the unsecured classes) are treated the same in the Plan and will each receive $50,000 from the $100,000 Unsecured Fund. There is no evidence - indeed the Objectors have offered none - that the Plan should be rejected because it fails to satisfy the "unfair discrimination" clause of § 1129(b)(1).

Considering the possible argument (which the Objectors have not offered),

that the Plan unfairly discriminates against the Stafford claimants because it may

potentially provide Class Three with a smaller percentage of recovery, the Court

further finds that such discrimination would not be unfair pursuant to § 1129(b)(1).

A rebutable presumption of unfair discrimination arises when there is:

> (1) a dissenting class; (2) another class of the same priority; and
> (3) a difference in the plan's treatment of the two classes that results
> in either (a) a materially lower percentage recovery for the dissenting
> class (measured in terms of the net present value of all payments),
> or (b) regardless of percentage recovery, an allocation under the
> plan of materially greater risk to the dissenting class in connection
> with its proposed distribution.

In re Armstrong World Indus., Inc., 348 B.R. 111, 121 (D. Del. 2006).  Because

the Objectors assert their Claims -- if not subordinated -- are worth approximately

four million dollars[29] (see Pretrial Statement, Docket entry no. 225 at 1) and the

Class Four claims (the other class of secured claims) are worth approximately

$2,811,521[30]  (Docket entry no. 380, exhibit A), the Court finds that the equal

distribution to each class currently proposed by the Plan would not rise to the

level of a *material* lower percentage recovery for the Objectors.  In other words, a

50% distribution of the Unsecured Fund to each class of unsecured claims is not

an unfair allocation of resources by the Debtor, where the amounts claimed by

---

[29] This amount is disputed by the Debtor.

[30] This calculation does not include the claims contested by the Stafford claimants.

each unsecured class are not in great disproportion.  <u>See</u>  <u>In re Matter of Great</u>

<u>Bay Hotel</u>, 251 B.R. 213, 231 (Bankr. D.N.J. 2000) (noting that courts which have

rejected confirmation due to unfair discrimination have done so because the plan

in question proposed "grossly disparate treatment").  Because the fund for

classes Three and Four comes from the sale proceeds, no materially greater risk

is imposed upon the Objectors than on the Class Four claimants.  Indeed, there is

no risk at all.

Further, the Debtor did not discriminate unfairly against the Objectors

because there is a rational basis for treating the claims of the Staffords differently.

A plan will not be found to have unfairly discriminated if :

> (a) the discrimination is supported by a reasonable basis,
> (b) the discrimination is necessary for reorganization,
> (c) the discrimination is proposed in good faith, and
> (d) the degree of the discrimination is directly related to the basis or rationale for the discrimination.

<u>In re TCI 2 Holdings, LLC.</u>, ___B.R.___, 2010 WL 1540115, at *26 (Bankr. D.N.J.

Apr. 12, 2010) (citation omitted).  These four factors are present here.  First, as

addressed in the discussion of classification of claims above, the different

treatment of the Stafford Claims is reasonable.  These Claims will likely be

subordinated and are based on litigation - not trade or ordinary course debt.

Therefore, individualized allocation to these Claims makes sense.  Second, the

Claims may need to be treated differently for reorganization; Class Four

represents, in part, trade creditors whom it is reasonable for the Debtor to prefer

because it may want to continue to do business with these vendors.  Third, there

is no evidence that the supposed discrimination was not proposed in good faith

and, as discussed above, the Debtor has acted in good faith in implementing its

Plan.  Fourth, the degree of the discrimination is minor (1.5% for Class Four

verses 1.25% for Class Three).  In short, any discrimination of the Objectors'

Class in not unfair because their Claims are fundamentally different from the

claims in Class Four.  See In re Sacred Heart Hosp. v. Norristown, 182 B.R. 413,

421 n.8 (Bankr. E.D. Pa. 1995) ("[d]issimilar treatment for dissimilar claims  does

not run afoul of the unfair discrimination provision").

Likewise, the Plan is "fair and equitable" pursuant to § 1129(b)(1).  The

Code gives guidance with regard to what qualifies a plan as "fair and  equitable."

With respect to a class of unsecured creditors, a plan must provide either of the

following:

> (i) . . . that each holder of a claim of such class receive or retain on account
> of such claim property of a value . . . equal to the allowed amount of such
> claim; or

> (ii) the holder of any claim or interest that is junior to the claims of such
> class will not receive or retain under the plan on account of such junior
> claim or interest any property. . . .

11 U.S.C. § 1129 (b)(2)(B)(I)-(ii).  Provision (ii) is the "absolute priority rule,"

specifying that "a plan cannot give priority to junior claimants over the objection of

a more senior class that is impaired." In re Armstrong World Industries, Inc., 432

F.3d 507, 513 (3d Cir. 2005).  The Debtor's Plan is fair and equitable and

complies with § 1129 (b)(2)(B)(ii).  As it stands, all unsecured creditors will

receive the same payout pursuant to the Plan and no junior interest holder will

receive a payment or retain its rights.  If the Stafford Claims are deemed

subordinated, then these Claims will receive no payment in assurance that the

absolute priority rule is not violated.  The Objectors do not contend and there has

been no showing that the Debtor's Plan is not fair and equitable.  The cramdown

provision of the Code has, therefore, been satisfied.  The Court is mindful that it is

in the best interests of this estate not to allow a minority of creditors to set the

course and determine the fate of the entire body of creditors, especially where, as

here, that minority may well be subordinated to unsecured creditors.  Indeed, this

is one of the purposes of the cramdown provision of the Code; "[a] cramdown

may be necessary under certain circumstances to foreclose the possibility that a

small minority would prevent confirmation of the plan." In re Armstrong World

Industries, Inc., 348 B.R. 111, 120 (D. Del. 2006) (citation omitted).

## III.  CONCLUSION

For the reasons set forth above, the Court concluded that the Debtor's Plan

of Reorganization/Liquidation is in the best interests of the creditors.  The Debtor

demonstrated that the Plan was proposed and executed in good faith.  The Court

remains satisfied that the Plan will provide the creditors of this cash strapped

Debtor with a fair return in a timely fashion.  The Objectors, on the other hand,

failed to demonstrate that that this Plan and the accompanying auction were

tainted by fraud, bad faith, or conspiracy.  For these reasons, the Court confirmed

the Debtor's Plan of Reorganization.


Dated:  May 19, 2010.                       _____

                                            JEAN K. FITZSIMON
                                            United States Bankruptcy Judge


Copies to:

Gretchen M. Santamour, Esquire
Stradley Ronon Stevens & Young, LLP
2600 One Commerce Square
Philadelphia, PA  19103

Lawrence Kotler
Duane Morris LLP
30 17th Street
Philadelphia, PA  19103

Lane L. Vines, Esquire
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA  19103

James E. Egbert, Esquire
Egbert & Barnes, P.C.
115 West Avenue, Suite 108
Jenkintown, PA  19046

George Conway, Esquire
Office of the United States Trustee
833 Chestnut Street, Suite 500
Philadelphia, PA  19107